B. A. Lewis *v.* W. W. Woodfolk.

## BURDETT A. LEWIS *v.* W. W. WOODFOLK.

1. LEX LOCI CONTRACTUS. Whatever constitutes a good defence by the law of the place where a contract is made, or is to be performed, constitutes a good defence wherever the question may be litigated. The lex loci acts upon the right, and the lex fori upon the remedy.

   Cases cited: 2 Kent, 595, 600; Pickering & Fisk, 6 Vermont R., 102.

2. FRAUD. Fraud in the inception of a contract is fatal to its enforcement, wherever the same may be litigated.

3. SAME. *Same. In sale of land.* In the sale of land, if there be no ingredient of fraud, and the party has not secured himself by covenants, he has no remedy even on failure of title.

   Cases cited: 2 Kent, 622; Maney *v.* Porter, 3 Hum., 347.

4. NOTE. *Inadequacy of consideration.* Inadequacy of consideration, without warranty or fraud, is no defense to a promissory note.

5. RECOUPMENT. Recoupment is not a matter of set-off arising on an independent contract, but for the purpose of reducing the plaintiff's damages, because he has not complied with the cross obligations under the same contract.

   Cases cited: Sedg. Meas. Dam., 496.

6. SAME. *Fraudulent misrepresentations.* Damages may be recouped for the value, quality or quantity of land when sustained by fraudulent misrepresentations, if susceptible of computation.

   Cases cited: Sedg. Meas. Dam., 500, 519; Porter *v.* Woods, 3 Hum., 60; Grouch *v.* Miller, 5 Hum., 586; Allen *v.* McNew, 8 Hum., 46; N. & K. T. Co. *v.* Harris, 8 Hum., 558; Henning *v.* Vanhook, 8 Hum., 678.

7. SAME. *Cross-action.* This defense only exists when a cross-action could be maintained.

   Cases cited: 5 Ind., 176. Sedg. Meas. Dam., 496.

8. SALE OF LAND IN GROSS. *Law of Louisiana.* Where land is sold in gross no action can be maintained for a diminution of price on account of deficiency in quantity.

   Cases cited: Zevengue *v.* Williams, 15 Ann. Rep., 76; Barrow *v.* Miller, 16 Ann. Rep., 114; Walker's Dig., 405.

9. SAME. *Warranty. Eviction. Law of Louisiana.* Vendor of land is never liable until the vendee is evicted by some lawful authority.

B. A. Lewis *v.* W. W. Woodfolk.

Cases cited: Morris *v.* Kenton, 2 Ann. R., 722; Fletcher *v* Carilin *et al.*, 10 La. R., 120; 7 La. R., 286; 19 Mart., La. R., 235.

10. SUCCESSION. *Legal representatives of. Law of Louisiana.* An administrator with will annexed may sue and recover upon a note made "to the order of the legal representatives of the succession" of the testator.

Code, § 2,788.

11. CONFLICT OF LAWS. Laws of other States are presumed to be the same as that of the State where the suit is brought, until the contrary is shown.

Case cited: Wharton Cont. of Laws, § 780.

12. CONSTITUTIONAL LAW. *Comity of States.* A change in the organic law of Louisiana, which annuls contracts for the sale of slaves in said State prior to the making of such change, is unconstitutional and void, and will not be recognized in this State, as valid by the comity of States.

Case cited: White *v.* Hart, 13 Wal., 647-654; 6 Adolph.; 2 Ellis, 989; Marbury *v.* Madison, 1 Cr., 137; Calder *v.* Bull, 3 Dall., 386; Satterlie *v.* Wattison, 2 Pet., 380; *ex parte* Garland, 4 Wal., 399; Dodge *v* Woolsey, 18 How. U. S., 331; Union Bank *v.* The State, 9 Yerg., 495.

13. COMITY OF STATES. *How far the principle is to influence the Courts of other States.* The comity of States is not a positive rule of law; one State can not dictate to another how to construe a contract sought to be enforced in its limits. A reasonable limitation of the rule is, that no community shall suffer prejudice by its comity.

Cases Cited: Sto. Cont. of Laws, 7, 8, 18, 20, 22, 23, 36, § 244-5; 5 La. Rep., 295; Forbes *v.* Cochran, 2 B. & C., 448: Smith *v.* Godfrey, 8 Forbes, 382; Ohio Ins. Co. *v.* Edmondson, 5 La. R., 295.

14. WARRANTY OF TITLE. A warranty of title is a covenant that the title is then good in the warrantor, but is not an undertaking for the future against the *vis major* of the government, by which the then existing title might be destroyed.

15. ATTACHMENT. *Ancillary.* The form of the writ of attachment given in this case was only intended for cases of original attachment, and does not apply to ancillary attachments. Although the absence of proof of publication can not be held fatal to the proceeding, the attachment is void because it does not refer to, describe, and identify the suit, in aid of which it was issued, so as to show upon its face that it forms an adjunct of that particular suit.

B. A. Lewis v. W. W. Woodfolk.

Cases cited: Ingle v. McCurry, 1 Heisk., 26; Woodfolk v. Whit-worth, 5 Cold., 565; Thompson v. Carper, 11 Hum., 545. Code, § 3475.

---

FROM DAVIDSON.

---

Appeal from the Circuit Court. EUGENE CARY, Judge.

J. C. and J. M. GAUT, W. F. COOPER and JOHN C. THOMPSON for Lewis.

GUILD & SMITH, D. CAMPBELL and M. M. BRIEN, for Woodfolk.

SNEED, Judge, delivered the opinion of the Court.

The plaintiff, Burdett Ashton Lewis, as the administrator of Wm. W. Wilkins, deceased, brought this action in the Circuit Court of Davidson County against the defendant, upon the several promissory notes executed by the defendant on the 10th day of January, 1860, and due and payable at one, two and three years from date, each for the sum of thirteen thousand five hundred and fifty dollars. In the Court below the verdict and judgment were against the defendant, from which he has appealed in error.

These notes were in the form following, and only varying in time of maturity:

"$13,550. ASHTON, LA., CARROLL PARISH,
January, 10, 1860.

"On the 10th day of January, A. D., 1861, I promise to pay to the order of the legal representatives of the succession of William Webb Wilkins, the sum

of thirteen thousand five hundred and fifty dollars, for value received, with six per cent. per annum interest, from date until maturity, and in case of default, with eight per cent. afterwards till paid; payable at the Citizens' Bank of Louisiana, New Orleans. B. C., due 10th and 13th January, 1861.

"Wm. W. Woodfolk.

"Indorsed across the face, '*Ne varietur*,' Parish of Carroll, La., Jan. 10th, 1860.

"J. W. Draughes, Recorder."

For the proper apprehension of some of the defences relied on, it is necessary to state that William Webb Wilkins died in the county of Henrico, and State of Virginia, leaving a last will and testament, in which his property was devised and bequeathed to his widow and children, some of the latter being minors. This will was duly proven and recorded in said county of Henrico, and the executor therein named having renounced the trust, the plaintiff, Burdett Ashton Lewis, was duly appointed and qualified as the administrator of said estate, with the will annexed.

At the time of his death, William Webb Wilkins was the owner of one-third interest in two plantations, with a large number of slaves upon each—the one called Welton, in the Parish of St. James, and the other called Ashton, in the Parish of Carroll, and State of Louisiana. This property he owned as tenant, in common with James A. Seddon and James

M. Morson, each owning one-third interest. These two plantations were, at the time of the testator's death, in operation for the benefit of the three owners, each of whom resided in the State of Virginia. Upon the death of William Webb Wilkins, it was thought expedient, by all parties in interest, who were *sui juris*, that this property in Louisiana should be sold for partition, and it was so agreed and determined. The widow and other devisees and legatees under the will, and the guardian of the minor heirs and legatees of William Webb Wilkins, thereupon executed to the plaintiff a power of attorney, conferring upon him full and ample authority to proceed to the State of Louisiana, and effect said sale, with a view to transfer the interest of said parties to the State of Virginia, where they were domiciled, thereby, in the language of said instrument, "authorizing our said attorney for us, and in our name, to ask, demand, take possession of and receive all and singular the property and estate, real and personal, movable and immovable, rights and credits, belonging or in any manner appertaining to the estate and succession of said deceased W. W. Wilkins, in the State of Louisiana, whether held and owned by said deceased individually or in partnership with others, to take all necessary and legal measures for the sale and disposal of the estate of said deceased. W. W. Wilkins, in said State of Louisiana, whether by public or by private sale, or in accordance with the stipulations of any partnership articles which may

have been entered into by said deceased, to receive the price of such sale, whether in cash or notes, and grant receipt and acquittance therefor, to institute or defend any partition suits that ·may be necessary for the purpose of effecting a settlement and liquidation of the succession of said deceased, and, in general, to do all that is proper and necessary for the purpose of converting the property of· said estate in Louisiana into cash or notes, so that the proceeds may be brought to Virginia for distribution amongst us, according to the provision of the will of said deceased."

In pursuance of this authority, the plaintiff proceeded to the State of Louisiana, where, upon an appropriate judicial proceeding, the said last will and testament was "ordered to be registered and executed according to law." A proceeding was thereupon instituted in the Courts of Louisiana, on behalf of the legatees and devisees of William Webb Wilkins, in which the said Seddon and Morson joined and concurred for the sale of said property, which was accordingly sold. In reference to this proceeding, a full and certified transcript whereof is before us, it is only necessary to say that, for the purposes of this case, it must be taken as valid, regular and conclusive upon the parties, as its validity has never been impeached in any appropriate form or forms of proceeding; that it stands in full force upon the judicial records of the State of Louisiana, and is entitled to "full faith and credit" in the Courts of this State. At the sale of the Ashton estate the land,

slaves, stock and provisions were all sold in bulk, at public auction, to the highest bidder, and defendant became the purchaser, at the price of $162,600, of which he paid one-fourth in cash, and for the deferred payments he executed his nine several promissory notes, for equal amounts, three of which were payable to the said James A. Seddon, three to James M. Morson, and three to "the legal representatives of the succession of William Webb Wilkins," the latter being the notes now in controversy. In said sale a lien was retained upon all the property, to secure the unpaid purchase money, and no warranty given except as to title in the slaves. The Sheriff, who sold the property under the orders of the Court, executed to defendant a deed to the whole estate, consisting of the Ashton plantation, described in said deed as the cotton plantation, known as Ashton, in the Parish of Carroll, Louisiana, fronting near a mile on the Mississippi river, running back, almost a parallelogram, about three miles, to and upon bayou Macon, bounded on the north by the Arkansas line, on the south by the bayou Macon road, containing, by estimation, about eighteen hundred acres, more or less.

The deed also names the slaves, ninety-eight in number, thus sold, giving their ages respectively, and mentions the personal property, consisting of mules, horses, and other live stock, provisions, and agricultural implements, all of which property, movable and immovable, was sold in bulk, as a whole, and bought by the defendant, who was placed in possession, and

has held the same, undisturbed, up to this time, ex-
cept the slaves, which were lost by the events of the
late civil war.    The deed concludes with the clause
following :

"Now, in order to secure the full, final and
punctual payment of each and all of said notes, and
all interest, cost and charges that may accrue on the
same, according to their tenor, and according to the
true interest and meaning of this act, the said Wm.
W. Woodfolk hereby expressly declares that he did
and does hereby specially affect mortgage and hypothe-
cate all of the foregoing described property, hereby
binding himself not to sell, mortgage, donate, alien-
ate, or in any other way encumber the said property
to the prejudice of this act of mortgage."

And it recites also, in another clause, the fact of
the vendor's privilege and special mortgage thus re-
served and given on the land and slaves, with no
warranty of the slaves, except as to title.    This deed
was signed by the Sheriff, and by the defendant
also, and was executed and delivered as an "authentic
act," according to the laws of Louisiana, and was
duly recorded in the Recorder's office, in the said
Parish of Carroll.

The "Wilton" estate was sold under the same pro-
ceeding, during the following month, and was pur-
chased by the surviving partners, Seddon and Morson,
who paid the cash payment due to the succession of
Wilkins to the plaintiff, and delivered to him the
notes for the payments deferred, which payment and

B. A. Lewis *v.* W. W. Woodfolk.

delivery were recognized in the judicial records of the Fourth Judicial District. Court for the Parish of St. James, in the words following: "Which notes, after having been signed '*ne varietur*,' by the Parish Recorder for identification with the said process verbal of sale, were delivered to B. Ashton Lewis, attorney in fact, and legal representative of the heirs of the late W. W. Wilkins, who hereby acknowledges the receipt thereof, as well as the sum of' twenty-seven thousand five hundred dollars, being the cash payment."

It appears in proof that the defendant owned a plantation very near to Ashton; that he examined things at Ashton very often, and it was well known long before the sale that he would be a bidder. A witness states that, on the day of sale, the negroes bought by the defendant were all present in a row. The Sheriff explained that it was a Sheriff's sale for division, by order of Court; that persons or purchasers must look at and examine the property for themselves; that no warranty would be given, except as to title; that the sale would be of all the property then present "in bulk;" that the advertised list of negroes was not accurate, but the negroes to be sold were all present, and could then be examined. "I saw Mr. Woodfolk," continues the witness, "walking among, talking with, and examining the negroes. The bidding soon commenced, and the property was cried off to Mr. Woodfolk. I, very soon after the deed was read and signed, left the place and returned

to my office. Mr. Woodfolk afterwards frequently spoke to me about his purchase, and expressed himself as very much pleased, and engaged me as his agent and physician. I never heard a word about his not liking the place or his purchase, or having any cause of complaint, until his notes for the credit payments became due. When the political trouble, after the election of Mr. Lincoln, depressed property, and made money scarce, and not until then did he make any complaint, and then he started a variety of complaints, and refused to make any payment on his notes. I know that he knew about the negroes he was buying, both as to their number and their qualities, and expressed to me his satisfaction after the sale."

The Recorder, who passed the deed to the defendant, testifies as to the perfect regularity of all the proceedings, and states that the clause, *de non aliendo*, in the deed, only prevented a sale of the property by defendant to the prejudice of the sellers; that he could always sell, but in the sale must provide for the payment of what he owed on the property; and indeed, in the opinion of the Court, such would necessarily be the legal construction of the instrument. This witness also says:

"I recollect distinctly that Mr. Lewis, the administrator, explained to Mr. Woodfolk that there were three slaves on the list sold in bulk, that were not on the place, but that there were others, not on the list, to a sufficient number, that would amply supply

their places.    The negroes were drawn up in a line, and were carefully inspected by Mr. Woodfolk, who expressed himself not only entirely satisfied, but very much pleased.    All the defects that any of said negroes had, were carefully explained to him, and he expressed himself delighted with his bargain, after the sale was over."

Another witness states that he was the overseer and manager of the Ashton estate at the time, and had been for a dozen years.    "The sale was at a time when cotton property was thought very highly of.    The defendant had a plantation very near.    He talked to me about buying the Ashton estate a great deal more than to anybody else.    He visited the place many times.    He measured carefully, with surveyors' instruments, the different portions of the place, to ascertain for himself how much was cleared, and how much was wood-land.    He looked at the negroes many times.    He talked with me and with them about the quality of different ones.    He talked with them about what they could do, about their disposition to be bought by him; and he acquired as perfect a knowledge of the land and negroes, and the other property on the place, as he well could do, and when the sale took place, on the 10th of January, 1860, he knew more about the place than anybody, but myself, and a great deal more than any of the proprietors, who all lived in Virginia."

Mr. Seddon had instructed the witness to bid for the place for himself and Mr. Morson, and he did so,

and afterwards offered, under the discretionary author-
ity conferred by Mr. Seddon, to take the purchase
off of defendant's hands, but he declined. He con-
versed with this witness about the purchase, and
seemed to be entirely satisfied. He stated to witness
that he had been offered twenty-five thousand dollars
for his bargain, but said he would not sell, except
for a great deal more than that. This witness further
testifies as follows:

"Before the sale, when I saw the advertisement,
I observed the names of Mary, Anny and Fanny
upon it. These women had been sent, long before,
to another place of the same proprietors; but others
had been brought from that place to Ashton. The
negroes at Ashton were more in number than were
advertised. I explained the matter before the sale,
and Mr. Woodfolk knew all about it when he bought;
knew what negroes he was buying, and got what he
bought, and was very much pleased, until the great
fall in property, when the troubles' began in 1861.
Zenar, or Lizzena, was sold and delivered."

In the original petition for the sale, as presented
to the Court, there is a general description of the
various tracts comprising the "Ashton land," and
among others, is the southwest quarter of section 10,
Town 23, Range 12, east, as containing one hundred
and fifty-one and fifty-six one hundredths acres, pur-
chased by the said firm of Morson, Seddon and Wil-
kins, of Hypolite Pargond, by act of sale passed in
the city of New Orleans, before Hilary B. Cenas, a

B. A. Lewis *v.* W. W. Woodfolk.

Notary of that city, 20th June, 1857, but which the said Morson, Seddon and Wilkins have agreed to exchange with William Cloman, for the southwest half of section 9, in Town 23, Range 12, east, as will appear by a contract under seal, signed by said Wm. Cloman, and Morson, Seddon and Wilkins, represented by James M. Morson and William Webb Wilkins, now deceased, in pursuance of which contract the said Cloman has tendered a deed for the land, which he is to give in exchange. The said southwest quarter of section 10, in Town 23, Range 12, east, is held by petitioners, and the said devisees of the said decedent, Wilkins, subject to the said contract of exchange with the said Cloman, and the said Cloman's rights under the same."

The defendant introduced upon the trial a plot of the lands constituting the "Ashton estate," and proved that the half of section 10, and the quarter of section 9, are both upon said plot, included within the boundaries of the Ashton estate; and that this plot was exhibited at the sale as a description of the lands; that the half of section 9 was owned by Cloman, and was to be exchanged for the southwest quarter of section 10; that the latter is better land than the half of section 9, one acre of it being worth two of the half of section 9. It was shown in defendant's testimony also, that several of the negroes were unsound; and the pecuniary damage to defendant by such unsoundness was also shown; and it was also shown that, during the late civil war,

the defendant had removed all of said slaves to the
State of Arkansas.   A witness was interrogated by
defendant as to the value of certain· slaves he had
never seen, upon the hypothesis of their soundness,
which was objected to by the plaintiff, and the ob-
jection sustained, to which defendant excepted.   The
same witness was, however, recalled, and the same
testimony, in substance, elicited, in another form and
without objection.   The defendant read to the jury
the clause of the Constitution of Louisiana of 1864,
abolishing slavery in that State, and also submitted,
as matter of evidence, the Constitution of 1868, con-
taining the provision that "Contracts for the sale of
persons are null and void, and shall not be enforced
by the Courts of this State."

We have thus stated all the facts necessary to be
considered in disposing of the several legal questions
presented in the views we. have taken of the case.
And here, at the threshold, we had as well dispose
at once of all defences which have for their founda-
tion the existence or hypothesis of fraud or misrep-
resentation in these transactions.   For it is certainly
true, that if fraud had intervened to the defendant's
injury, the law will interpose for his indemnity in
this litigation, to the uttermost farthing of the damage
done.   And if this element does not exist in the
case, it is equally clear that he must stand or fall
upon the contract he has made, and upon the prin-
ciples of law by which that contract is to be con-
strued and expounded.   It is a fundamental rule of

our jurisprudence that whatever constitutes a good defence by the law of the place where the contract is made, or is to be performed, is equally good in every other place where the question may be agitated. And while the question as to what appropriately belongs to the contract itself, and what to the remedy, is not always a question of easy solution, yet the rule has become a part of the *jus gentium,* among civilized nations, that the *lex loci* acts upon the right, and the *lex fori* upon the remedy. 2 Kent, 595, 600; *Pickering* v. *Fisk,* 6 Verm. R., 102. But, independent of these technical rules, the element of fraud in the inception of the contract inheres in it as a morbid and chronic disease, and upon the principles of morality, would be fatal to its enforcement anywhere. It was the technical rule of the common law, as stated by Chancellor Kent, that in the sale of land, the party was remitted back to the covenants of his deed; and if there be no ingredient of fraud in the case, and the party has not had the precaution to secure himself by covenants, he has no remedy for his money, even on failure of title. 2 Kent, 622; *Maney* v. *Porter,* 3 Hum., 347. And it is well settled everywhere that mere inadequacy of consideration, without warranty or fraud, is no defence to a promissory note. The contract in this case was made in Louisiana, which is the place indicated for its performance also. The defences which would have been availing in that State, if the remedy had been sought there, must be good here also, if they be such

as would be recognized as valid by the supreme law of the land. The defendant claims that he was overreached and defrauded in this transaction, by the representation that a small tract of land comprised a part of the Ashton estate bought by him, when in fact it was owned and claimed by another; that four slaves were represented to be of the number sold, when in fact they were not included, and that certain of the slaves actually bought were unsound; and upon these grounds he bases his demand in part for an abatement of the plaintiff's recovery.

We are of opinion that, upon these grounds, the defendant has failed to make out his defence. The defence under the doctrine of recoupment is well recognized in this State. It was originally a right of reduction from the amount of the plaintiff's recovery, on the ground that his damages were not really as great as he alleged. The modern defence of recoupment is not presented as a matter of set-off, arising on an independent contract; but for the purpose of reducing the plaintiff's damages, because he has not complied with the cross-obligations arising under the same contract. Sedg. Meas. Damages, 496.

It seems to be well settled that the defendant may recoup the damage sustained by the fraudulent misrepresentations of the plaintiff as to the value, quality or quantity of land, if such damage be susceptible of computation. And the doctrine has sprung from the policy of the law in adjusting all controversies between the same parties in one suit. Sedg.

Meas. Damages, 500, 519; 3 Hum., 60; 5 Hum., 586; 8 Hum., 46, 558, 678. But this defence only exists where a cross-action would be maintained. *Clark* v. *Wildridge,* 5 Ind., 176; Sedg. Meas. Dam., 496.

The record fails to disclose any misrepresentation in this case as to the Cloman land, or that plaintiff in error is likely to be disturbed in the possession of an acre of the Ashton plantation as bought by him. The sale was in gross, and not by the acre, and the estimate, 1800 acres, "more or less," under general, and not specific boundaries. It was a sale *per aversionem,* as it is denominated in Louisiana. And according to the law of that State, "when the land sold is described in the act of sale, by reference to adjoining tenants, and sold from boundary to boundary, no action can be maintained for a diminution of price, on account of deficiency in quantity." *Zevengue* v. *Williams,* 15 Ann. R., 76; *Barrow* v. *Miller,* 26 Ann. R., 114; Walk. Dig., 405.

But this defence may be disposed of on other and different grounds. There being no eviction, no misrepresentation, and no proof before us upon which any Court could act, that the defendant is not now in the actual enjoyment of the Ashton estate as described in the petition for a sale, wherein the exact status of this Cloman fraction was especially given, we see no ground upon which a claim to recoupment could rest. And in respect to the necessity for an eviction, even where there is a warranty, we do not

understand that the laws of Louisiana differ materially from our own. The eviction under the Code of that State is the loss suffered by the buyer of the totality of the thing sold, or of a part thereof occasioned by the right or claims of a third person. Code of La., Art. 2476. Although, at the time of the sale, no stipulations have been made respecting the warranty; the seller is obliged, of course, to warrant the buyer against the eviction suffered by him of the totality or part of the thing sold. Art. 2477. That the warranty should have existence, it is necessary that the right of the person evicting shall have existed before the sale. Art. 2478; 1 Ann. R., 200. But the parties may add to or diminish the effect of the warranty, and they may agree that the seller shall not be subject to any warranty. Art. 2479. In this case there was no stipulation whatever as to warranty in regard to the land, and the warranty as to the slaves was only as to title. But under the laws of Louisiana it is held that the vendor is never liable until the vendee is evicted by some lawful authority. *Morris* v. *Kenton*, 2 Ann. R., 722. And again, the warrantor is not to be called on to reimburse until judgment of eviction has had its effect against the party evicted. *Fletcher* v. *Carilin et al.*, 10 La. R., 120; 7 La. R., 286. And again, in the case of *Brown* v. *Reeves*, it was held that so long as the buyer is in peaceable and undisturbed possession of the thing sold, he can not withhold payment on the plea of a want of title in the vendor. 19 Mart.

La. R., 235. In any view of this branch of the case, therefore, we think the defendant has failed to show any ground that would authorize an abatement of the plaintiff's claim. In regard to the question of fraud in the sale of the slaves, it is sufficient to say that upon the proof it has no foundation, and in the absence of any warranty as to the soundness of any one of the slaves, this whole defence must fall to the ground. It is needless to elaborate this branch of the case further; but it is proper to say that, after a very careful examination of the evidence, we are unable to find the slightest foundation to impeach the sale of this property, or any part of it, upon the ground of any irregularity to the judicial proceeding, or any want of the most perfect good faith, either in the vendors or their agents in the transaction.

And all these questions were fairly submitted to a jury upon a correct charge of the law, and we see no reason to question the correctness of their verdict. But other questions remain. It is insisted on behalf of the defendant that this action can not be maintained by the plaintiff as the legal representative of the succession of William Webb Wilkins; that he is, in fact, not the payee of the notes under the laws of Louisiana. The declaration is in the name of Burdett Ashton Lewis, administrator, with the will annexed, of William Webb Wilkins, and recites the execution of the notes; that they were payable to the legal representatives of the succession of Wm.

Webb Wilkins, and their delivery to the plaintiff, whereby the defendant then and there became liable to pay to the plaintiff the said sums of money in the notes specified according to the tenor and effect thereof. The declaration is sufficient on its face to charge the defendant. Without considering the question upon the effect of our statutes, as to the propriety of a sworn plea to raise this issue, we hold that the plaintiff is, in law and in fact, the legal representative of the succession of Wm. Webb Wilkins. The word "succession," under the laws of Louisiana, means "the transmission of rights and obligations of the deceased to the heirs." Code, Art. 867. But the word under the same Code has another and a more general meaning. It signifies the "estate, rights and charges a person leaves after death." Art. 868, and in this last sense can not be distinguished from an estate as understood by our laws. The Code of Louisiana uses the words "representative of succession" as referable to the office of administrator. Code of La., Revisal of 1856, 3, § 6; Rev. 1870, §§ 1467, 1468, 3712, 3577, 3810. If, then, the word "succession" means the "estate," although it may have other meanings, yet under the law of that State, it would be no strained construction to hold that the representative of a succession, as the terms are used in these notes, mean the representative or administrator of the estate in the sense of our own laws. And it is the general rule to hold that the law of another State is the same as that of the State in which the suit

is brought, until the contrary be shown. Whart. Conf't. Laws, § 780. But in either sense of the term the plaintiff was, at the time of the execution and delivery of these notes to him, as a matter of fact, the legal representative of the succession of Wm. Webb Wilkins, whether as the representative of the instituted heirs under his power of attorney, or as the administrator representing the estate, and he was recognized as such by the Courts of Louisiana, and designated upon the records of the Court in St. James Parish as "the legal representative of the heirs of Wm. Webb Wilkins," to whom, as such, the notes were delivered.

We are of the opinion that, for the purposes of this action, the plaintiff is the legal representative of the succesion of Wm. Webb Wilkins. In any view, the objection is more formal than substantial, and relates more to the remedy than the right. Under the power of attorney he had a right to demand and receive the notes as the representative of his constituents, who were the instituted heirs of the succession of Wm. Webb Wilkins. The transaction was for the purpose of transferring the estate to Virginia, where he was technically its legal representative. The notes were delivered to him as such, and he was described as such, and as such was recognized by the Courts of that State. He is the holder of the notes, and has deraigned his right to hold them, through his power of attorney and the judicial record from Louisiana; and this being so, he

has a right to sue under our statute in the name or description used in the instrument. Code of Tenn., § 2788.

Another defence relied upon, and which arises upon the pleadings is, that so far as the slave property is concerned, the consideration of these notes has totally failed, by reason of the abolition of slavery. A clause of the Constitution of Louisiana and certain judicial rulings of that State are relied on to defeat this action to the extent of the value of these slaves, the effect of which is, that contracts of this nature can not be enforced in the Courts of Louisiana. We might very summarily dispose of this defence upon the ground that prior to this change in the fundamental law of Louisiana, the defendant had voluntarily changed the legal status of this property by its removal to another State, where it, in fact, perished upon his hands, and that by this conversion of the property, his own legal obligations in regard to it were also changed; but without reference to that view of it, we think the adjudication of this question against the defendant may safely repose upon another and different ground. Under the repeated adjudications of this Court as to contracts of this character, made in this State, such a defence is unavailing. Our Courts having recognized in its fullest extent the maxim drawn from the civil law, that "after the bargain is completed, the purchaser stands to all losses," *res perit suo domino.*

We have already stated the general principle, that

whatever constitutes a good defence in the State where the contract is made or to be performed, is equally good in the State where the contract is litigated, with the important qualification that such defence is consistent with the paramount law of the land. The paramount law of the land in this country is the Constitution of the United States, and the law made in pursuance thereof, and the treaties made, or which shall be made, under the authority of the same, and the Judges in every State shall be bound thereby, any thing in the Constitution or laws of any State to the contrary notwithstanding. Const. U. S., Art. 6, § 2. And "whether the State law is organic in its Constitution or any ordinance, or whether it be a statute, if it violate the Constitution, laws, or a treaty of the United States, it is simply void, and the Courts of every State are bound by the Supreme law, and not by the State law." *Marbury* v. *Madison,* 1 Cr., 137; *Calder* v. *Bull,* 3 Dall., 386; *Satterlie* v. *Wattison,* 2 Pet., 380; ex parte *Garland,* 4 Wal., 399. The obligation of a contract can no more be impaired by the Constitution of a State than by an act of its Legislature. *Dodge* v. *Woolsey,* 18 How. U. S., 331. And so it was held by this Court that "a convention of a State has no power to violate contracts more than an ordinary Legislature." If it had, there would be no safety in times of excitement, under our form of government, for the most sacred rights. *Union Bank* v. *The State,* 9 Yerg., 495.

With these principles in view, we come now to consider to what extent the Courts of States will enforce the general doctrine stated, that a defence good under the *lex contractus* will be good under the *lex fori*, with reference to the complications of the case in judgment. We do not understand this rule to be matter of positive law, for it is certainly a sound principle in the abstract, that one State can not dictate to another how to construe a contract sought to be enforced in its Courts. The doctrine rests upon comity, and not upon positive law. "Every independent community," says Mr. Story, "will and ought to judge for itself how far that comity ought to extend. The reasonable limitation is that it shall not suffer prejudice by its comity." Story Conf't. Laws, § 244.

In a case in Louisiana it was said that, by the comity of nations, a practice has been adopted by which Courts of Justice examine into and enforce contracts from other States, and carry them into effect according to the laws of the place where the transaction took place. "It is subject to the exception that the contract to which aid is required should not, either in itself or in the means used to give it effect, work an injury to the inhabitants of the country where it is attempted to be enforced." *Ohio Ins. Co.* v. *Edmondson*, 5 La. R., 295. "In cases turning," said Mr. Justice Bart, "upon the comity of nations, *comitas inter communitates*, it is a maxim that the comity can not prevail in cases where it violates

the law of our own country, or the law of nature, or the law of God. Contracts, therefore," he concludes, "which are in evasion or fraud of the laws of a country, or of the rights or duties of its subjects—contracts against good morals, or against religion, or against public rights, and contracts opposed to the national policy or national institutions, are deemed *nullities* in every country affected by such considerations, although they may be valid by the law of the place where made." *Forbes* v. *Cochran*, 2 B. & C., 448; *Smith* v. *Godfrey*, 8 Forbes, 382; Story Conf't. L., §§ 244–5. These exceptions, it is said, result from the consideration that the authority of the acts and contracts done in other States, as well as the law by which they are regulated, are not *proprio vigore*, of any efficacy beyond the territories of that State; and whatever effect is attributed to them elsewhere is from comity, and not of strict right. Story Conf't. L., §§ 7, 8, 18, 20, 22, 23, 36, 244.

Now the change in the organic law of Louisiana, which in its terms annuls and destroys this contract and forbids any remedy for its enforcement in that State, was effected long after this contract was made. At the time of the contract, and according to the *lex loci* at that time, the contract was a valid and binding obligation to pay for these slaves. There was a warranty then of the title, that the title was then good in these vendors; there was no warranty against the *vis major* or the act of the government, by which the then existent title might be destroyed.

4

The obligation to pay inhered in the contract, and followed the defendant wherever he might go, and into whatever forum he might be brought for its enforcement. The obligation to pay was not merely impaired, but utterly destroyed, by this change in the organic law, and it is argued that this retrospective principle inheres in, and is to be taken as a part of the contract in the Courts of this State. In other words, we are asked upon the mere comity of States to recognize a law of another State which, so far as it relates to this contract, is a nullity under the paramount law to which the *lex contractus* and the *lex fori* are both subordinate. This we can not do. It is not necessary to enter into any elaborate discussion of the question whether such a principle in the organic law of a State is or is not an infraction of the fundamental law. The question in analagous cases has been before the highest tribunal, and it has been so held, and, as we think, upon the soundest principle. In the case of *White* v. *Hart*, 13 Wal., 646, it was held that the provision of the Constitution of Georgia of 1868, providing that "no Court or officer shall have, nor shall the General Assembly give jurisdiction to try, or give judgment on, or enforce any debt, the consideration of which was a slave or the hire thereof," had no effect on prior contracts; that a note given for a slave, slavery being at the time lawful, by the law of the place when the note was given, is valid, and that the ideas of the validity of a contract, and of the remedy

to enforce it are inseparable; and both are parts of the obligation which is guaranteed by the Constitution against invasion; and that when a State, in modifying any remedies to enforce a contract, does so in a way to impair substantial rights, the attempted modification is within the prohibition of the Constitution, and to that extent void. 13 Wal. R., 647. In the case of *Osborne* v. *Nicholson*, also, it was held that a covenant of warranty of title and slavery for life, in the sale of a slave made prior to the abolition of slavery in Arkansas, was not broken by the ordinance of abolition, so as to defeat the vendor's right to recover the price. 13 Wal., 654. In this case, certain English cases are cited in illustration of the maxim that, after the bargain is completed, the buyer stands to all losses, and among them, that of *Mittetholzer* v. *Fullartor*, from the Queen's Bench, in which the contract was made at Burbice, in British Guinea. The plaintiff sold to the defendant the services of one hundred and fifty-three apprentice laborers, who had been slaves, for £7,800, payable in six annual installments of £1,300 each. The defendant paid four installments. The apprentices were then declared free by the local government. The defendant refused to pay the two last installments. The suit was brought to recover them. The Court held that the plaintiff was entitled to judgment, though the Legislature had determined the apprenticeship before they became due. The observa-

tions of some of the learned Judges in this case are worthy of consideration.

Lord Ch. J. Denman said: "My brother Weightman asked, during the argument, what would have been the result, if at the end of a year the services had been determined by the act of God? And to this no sufficient answer was given. The plaintiff's right vested when the bargain was made. The subsequent interference of the Colonial Legislature does not prevent his recovering what was then stipulated for."

Williams, Justice, said: "The whole question is, who shall bear the loss occasioned by the *vis major?* And that depends much upon the question, who was proprietor when the loss was occasioned?" 6 Adolph; 2 Ellis, 989.

This doctrine, however, is so firmly engrafted upon the common law, and is so consonant with justice and sound reason, that it will scarcely be questioned now. It has been sought to vary it in its application to contracts for slaves, on account of the alleged immorality of slavery; that there was an inherent vice in the very nature of slave property, causing the title to a slave merely to be tolerated, but without any obligation on the part of the government to protect it.

It is sufficient to say, in reference to this proposition, in the words of an ancient maxim of the common law, *novitas non tam utilitate prodest quam novitate perturbat;* that it is in direct antagonism to the

judicial rulings of this country from the foundation of the government, and that it is an emanation from the *jus excelsior* of the political arena, rather than a legitimate deduction from any recognized principle of law. With the morality of slavery we have nothing to do, but simply to announce the laws of property as we find them in reference to contracts of this character. We are of opinion that, neither under the comity of States, nor upon any other principle, can the Courts of this State tolerate a defence to this action, based upon a provision of the Constitution of Louisiana, which is repugnant to the organic law of the land.

A question is made upon the validity of the ancillary attachment, which was issued and levied in this case in aid of the action already begun by the service of the ordinary summons. The petition for the attachment, which, with the jurat attached, is, in legal effect, the affidavit required by law, seems in substance to conform in every particular to the requirements of the rule repeatedly announced by this Court, and the grounds of exceptions are that these are not formally repeated in the writ, and that no publication is shown to have been made. The petition alleges the institution of suit in the Court from which the attachment is sued out, the nature of the debt sued on, that the same is due and unpaid, that the defendant has fraudulently disposed of his property, or is about to do so, and prays for an attachment ancillary to the suit, "commenced as aforesaid." The writ is in the form prescribed

in the Code, with the words, "ancillary to a suit at law heretofore commenced," superadded.

The leading process in this case is the original summons. It was served upon the defendant, and brought him into Court, where he appeared and made defence to the original action. Under this state of facts, the absence of proof of publication can not be held fatal to the proceeding, the ancillary attachment, unlike the original attachment, being subsidiary process merely, and its only office being to hold the property attached for the satisfaction of the judgment to be recovered in the original action. It does not bring the party into Court. 1 Heisk., 26. Before the Act of 1843, ch. 29, the ancillary attachment was unknown to our law, and no form was prescribed for the writ by that Act. The Act of 1794, ch. 1, § 24, had prescribed a form for the writ in cases of original attachment, and this form has been brought into the Code as the only form prescribed for the writ in cases other than judicial attachments, which latter class are founded upon the return of the Sheriff upon our original summons. It is insisted that this form was prescribed for the original and ancillary writ alike. This form is given and prescribed in the chapter of the Code which authorizes and regulates the remedy by attachment generally, which chapter embraces the only authority for the ancillary writ, and it is followed by a positive provision that "no objection will lie to the form of the

attachment, if the essential matters in said precedent be set forth in such attachments." Code, § 3475.

The form of the writ in this case conforms to that precedent, except in the superadded words, that it is "ancillary to a suit at law heretofore commenced." And this was the state of the statutory law at the time of the inception of these proceedings. But it is insisted that the attachment is a nullity, because the writ does. not repeat the words of the affidavit as required by certain rulings of this Court in divers reported and unreported cases, adjudicated both prior and subsequent to the adoption of the Code, and we are called upon to review these decisions, and to declare the effect of the legislation referred to upon this question. It is certainly true that the Legislature has a right to prescribe the rules and precedents of practice in such cases, and if this be done the Courts can not depart from them, except for some extraordinary reason involving the repugnance of such rules and precedents to the organic law.

The writ of attachment is an extraordinary remedy, given to the creditor against his fraudulent or non-resident debtor, and while the laws are to be liberally construed in favor of the remedy, yet the consequences are of such a serious and harrassing character to the defendant himself, in the seizure and impounding of his property, that every expresss requirement of the law must be observed. Thus, an oath in writing is required, which, with the bond, is filed in Court as part

of the record, that the defendant may be advised of the nature and cause of the proceeding. The nature and amount of the debt or demand must be stated, and that it is a just claim, or equivalent words, which import that fact; and also that some one of the statutory causes exist which authorize the writ. The writ itself is the mere mandate of the law to the officer, and simply requires of him to perform an official duty. It would seem to be unnecessary, in the absence of any rule upon the subject, that the writ should contain any thing more than the direction to the officer in the form prescribed in the Code, except in the ancillary writ such words as may identify its connection with the original suit. The property is to be impounded for the satisfaction of the particular debt sued for, and the connection of the ancillary writ with the original action should be identified, so that after judgment the Court may advisedly proceed to appropriate the property in satisfaction of the debt for which it was attached. The words, "ancillary to a suit at law heretofore commenced," would seem sufficient for this purpose if there be but one suit between the parties in the Court, for the ancillary suit is made returnable to the Court where the suit is pending, and where the record is ready to advise the defendant as to all the requisites of the affidavit as required by law. But suppose there be two or more actions, brought by the same plaintiff, against the same defendant, in the same tribunal, and the plaintiff sues out the ancillary attachment in aid of each suit, the levy upon each is upon different property,

and there is nothing to identify the connection of the writs with the suits respectively, except the general words, "ancillary to a suit at law heretofore commenced," might not very serious embarrassments follow in the appropriation of the property, especially in the event of a sale and assignment of either of the judgments? The rulings of this Court upon this subject, which, in ancillary attachments require that both the affidavit and the writ should state certain facts, would seem, therefore, to be founded in sound wisdom and forecaste, and are necessary to give efficacy and certainty to this remedy. In the language of this Court, "both the writ and the affidavit must refer to and describe and identify the suit, in aid of which the writ issues, so as to show unmistakably upon their face that they form an adjunct of that particular proceeding." 5 Cold., 565. It is conceded at the bar, that at the time the rule had its origin in an alleged *dictum*, it was a good one, and that there was no statute to the contrary. 11 Hum., 545. But it is insisted that the Code has changed the rule, by prescribing a general precedent for the writ. If the Legislature had clearly manifested an intention that the form prescribed by the Act of 1794 for the original attachment, which is brought into the Code, should also be the form for the ancillary writ, we could but yield to such clearly manifested intention, whatever amount of confusion, uncertainty and embarrassment might follow in practice. But in view of the absolute necessity for identifying the writ and affidavit in such cases with the original

suit, we are of opinion that the form given in the Code was only intended, as it was in the old law, for cases of original attachment, and that in the absence of any prescribed form for the ancillary writ, it was left to the Courts to adopt such rules of practice as would be consonant with the spirit of the law, and would make the remedy efficacious and certain. We are satisfied with these rules, and think they are founded in good sense and reason. And even if they were not, they have been sanctioned as rules of practice by this Court in many reported and unreported cases for near a quarter of a century; they have controlled the rights of property, and have been adhered to without the shadow of turning; they have gone into our new revisals for the guidance of the humblest of our judicial tribunals, and have come to be accepted as the settled law. Under such circumstances we would hesitate long to disturb them, even if they were utterly indefensible upon principle or reason.

"We have had occasion," say this Court in an early case, "to express our sense of the importance of adhering with some uniformity to decisions when once made, deeming fluctuation of judicial opinion an evil of such magnitude as not to find its equipoise of good in any fancied or real approximation to greater correctness."

The attachment in this case is null and void, and will be discharged. In all other respects the judgment will be affirmed.